FILED
IN CLERK'S OFFICE
U. S. DISTRICT COURT E.D. N.Y.

★ AUG 2 4 2005 ★

TIME A.M._____
P.M._____

D+F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

Stephanie Pava,

                                    Plaintiff,                        03 CV 2609 (SLT) (RML)

            -against-                                            MEMORANDUM
                                                                     & ORDER

Hartford Life and Accident Insurance Company,
and Pharmanet, Inc. Long Term Disability Plan,

                                    Defendants.
-----------------------------------------------------------X

TOWNES, District Judge:

        Plaintiff Stephanie Pava ("Plaintiff") brings this civil action against defendants

Pharmanet, Inc. Long Term Disability Plan (the "Plan") and Hartford Life and Accident

Insurance Company ("Hartford") (collectively the "Defendants") under 29 U.S.C. §

1132(a)(1)(B). She claims that she was improperly denied long-term disability benefits under the

Plan, an employee welfare benefit plan regulated by the Employee Retirement and Income

Security Act, as amended, 29 U.S.C. § 1000-1461 ("ERISA"). Both parties move for judgment

on the administrative record. For reasons discussed herein, Defendants' motion is granted and

Plaintiff's motion is denied.

## STATEMENT OF FACTS

        On December 27, 1999, Plaintiff began her employment with Pharmanet, Inc. as a

Medical Writer. (*See* AR 715-23.)[1] Her employer established and maintained the Plan, which is

funded by a group insurance policy issued by Hartford (the "Policy"). (*See* AR 1-51.) On

February 1, 2000, Plaintiff became a participant in the Plan. (*See* AR 715-23.)

_____

[1] Citations to the Administrative Record are indicated as "AR ___."

1

The Policy provides coverage to active, full-time employees of Pharmanet, Inc. (AR 27-29.) It defines "Disability or Disabled" as

> during the Elimination period[2] and for the next 24 months you are prevented by:
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
> After that you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

(AR 30.) An "Essential Duty" is one that (1) "is substantial, not incidental;" (2) "is fundamental or inherent to the occupation;" and (3) "can not be reasonably omitted or changed." *Id.*

After a participant submits a claim, she must also submit "Proof of Loss." (AR 40.) This includes, but is not limited to, documentation of the date the disability began, its cause, its prognosis; any and all medical information; and the names and addresses of all health care providers. *See id.* The Policy states that "proof of loss must be satisfactory to us." *Id.*

*Plaintiff's Medical Evaluations*

Plaintiff claims that she is suffering from Chronic Fatigue Syndrome ("CFS") and Fibromyalgia. Her diagnosis is heavily disputed. Although the parties disagree about when

---

[2] "The Elimination period is the period of time you must be Disabled before benefits become payable. It is the last to be satisfied of the following:
1. The first 3 consecutive month(s) of any one period of Disability; or
2. With the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program." (AR 28.)

Plaintiff first saw her Primary Care Physician, Dr. Sudhanshu Prasad,[3] his notes indicate that he saw her on November 4, 1999, December 17, 1999, February 14, 1999,[4] and April 24, 2000. (AR 473-74.) He indicated that Plaintiff complained of various ailments including a cold and congestion and, he prescribed medication. *Id.*

In June 2000, Plaintiff first saw Dr. Joseph John, a specialist in infectious diseases and allergies. (*See* AR 557.) In a letter dated August 8, 2000, Dr. John informed Hartford that Plaintiff has "multiple medical problems," including diabetes, hypertension and morbid obesity. (AR 558.) He also reported: "It is my opinion that Ms. Pava is suffering from a chronic inflammatory state as indicated by her history, my examination and the preponderance of laboratory data...[S]he most likely will be completely or partially disabled for at least three months hence." *Id.* On September 15, 2000, Dr. John signed a form, which was submitted to Hartford with Plaintiff's application for long-term disability benefits, indicating that Plaintiff could only stand for "30 minutes max;" walk for "15 minutes max;" that she would "fatigue after 1 hour" of sitting; and that her keyboard/repetitive hand motion was limited to "½ hour." (AR 709; AR 723.)

On January 16, 2001, Plaintiff saw Dr. Steven Stanzione, an oncologist. (AR 357.) His letter from that date states that he saw Plaintiff "for the problem of lymphnadenopathy, with fevers and night sweats, in the face of continuing [Epstein Barr] virus." *Id.* In a letter dated February 2, 2001, after his review of CT scans of Plaintiff's abdomen, pelvis, and thorax, Dr.

---

[3] Plaintiff alleges that she originally treated with Dr. Prasad on May 23, May 30, and June 5, 2000. (Pl. 56.1 Stat. ¶ 47.) Defendants claim that Plaintiff originally treated with him in August and October 1999. (Def. 56.1 Stat.¶ 47.)

[4] Since both parties agree that she did not begin seeing Dr. Prasad until at least after August 1999, the Court assumes this date to be February 14, 2000.

3

Stanzione concluded that "this does look like chronic [Epstein Barr] virus with a failure to resolve her infection." (AR 356.) He continued: "Most of these patients have smoldering low-grade infections with this, and ultimately they do resolve with an elevated antibody titer to the virus and then resolution of the infection." *Id.*

In March 2001, Plaintiff began treatment with Dr. Susan Levine, whose curriculum vitae reveals a long and questionable history of study of and advocacy about Chronic Fatigue Syndrome ("CFS").[5] (*See* Pl. Stat. ¶ 52; AR 484-86.) In a letter dated October 5, 2001, Dr. Levine wrote that *inter alia* Plaintiff suffers from a "severe sleep disorder" and:

> almost constant fatigue which is made worse by even minimal increases in physical activity but which she tries to manage by frequent 'rests'; she also reports the following: sore throats; low grade fevers (she keeps a temperature log); cognitive problems, including difficulty processing new, incoming information and making calculations or remembering people's names; viral infections; headaches; and palpitations and dizziness.
>
> ***
>
> [B]ased on patient's severe and frequent symptoms which are completely debilitating; my wide experience in treating patients with CFS and [Fibromylagia] and in following their natural history over time which does not respond to any interventions; and observing this patient's lack of progress despite her motivation to get better I deem her prognosis to be poor and recommend total and permanent disability.

(AR 468.)

Six months later, Dr. Ekaterina Malievskaia, Associate Medical Director for Hartford, issued a report summarizing her review of Plaintiff's medical records and without conducting a

---

[5] As reported in *Lochner v. Unum Life Ins. Co. of Am.*, 2002 U.S. Dist LEXIS 3745, at *13 n.6 (S.D.N.Y. March 7, 2002), Dr. Levine has had her license to practice medicine suspended in connection with fraudulent and incomplete CFS diagnoses. *Solaas v. Delta Family-Care Disability & Survivorship Plan*, 2005 U.S. Dist. LEXIS 5269, at *9 (S.D.N.Y. March 29, 2005).

physical examination. (*See* AR 439-44.) Dr. Malievskaia states that Plaintiff "alleges she is unable to return to work due to FUO (fever of unknown)," and concludes that the records she reviewed did not support this diagnosis. (AR 443.) She also concludes that although Plaintiff demonstrated elevated CD4 count, elevated WBC and elevated antibodies to Epstein-Barr virus which "could be elevated in the presence of chronic infection, they do not constitute the basis for disability in the absence of objective evidence for [*sic*] infection. " *Id.* She concluded that Plaintiff was "fully capable of meeting the demands of a sedentary occupation." (AR 444.)

In March 2002, Dr. Kenneth Gold, Psy.D., upon referral from Dr. Levine, examined and tested Plaintiff over three days. (*See* AR 286.) In his report, he wrote: "Overall, intellectual testing revealed significant deficits in speed of mental processing and graphmotor speed as well as a mild, relative deficit in immediate memory and concentration in the context of premorbid functioning in the Superior to Very superior range." (AR 290.) However, he concluded that "test performance failed to support clinical reports of impairment in short-term memory functioning." *Id.* He also noted that "the most salient areas of deficit...are in the rapid processing of information and graphmotor speed. These findings are consistent with clinical reports of slowed mental processing...However, the relative contributions of several additional factors including depression and pain cannot be completely ruled out." (AR 292.) On May 6, 2002, in response to a letter from Plaintiff's attorney, Dr. Gold wrote: "While it is impossible to predict future occupational functioning, it is reasonable to assume that if not properly addressed, Ms. Pava's deficits in speed of mental processing would have a considerable impact on any occupation she may have in the future, including that of medical writer." (AR 294.)

On May 17, 2002, Dr. Levine wrote a letter to Plaintiff's attorney updating him on

5

Plaintiff's progress. (AR 279-82.) In this letter, she detailed the results of Plaintiff's neurocognitive testing performed by Dr. Gold; stated that Plaintiff "had the diagnosis of Fibromyalgia confirmed by a rheumatologist;" and concluded that "due to the longevity and severity of Ms. Pava's symptoms, especially her severe exhaustion and neurocognitive complaints, her prognosis remains poor and she is extremely unlikely to recover any of her physical or mental capabilities." *Id.* Three months later, Dr. Levine informed Hartford that Plaintiff "cannot stand [more than] 10 minutes; cannot walk [more than] 2 blocks; cannot climb [more than] 7 flights of stairs; cannot lift or carry more than 10 pounds for more than 20 feet; cannot read [for more than] ½ hours without getting confused." (AR 188.)[6]

After Hartford denied Plaintiff's first appeal and to complete its review of her file upon her second appeal, it commissioned another review of Plaintiff's file. Dr. Scott Yarosh[7] performed this review and submitted it to Hartford in a report dated September 3, 2002. (*See* AR 176-86.) After his review of Plaintiff's medical records, job description, and without a physical examination, he concluded that Plaintiff "may have [CFS]." (AR 185.) However, he also wrote that "[t]here is no objective medical information in the records that would indicate that Ms. Pava is unable to perform the duties of her job as a medical writer. In fact, her own correspondence indicates that she can carryout [*sic*] the tasks of writing at a high enough cognitive level to be clear and understood." (AR 186.)

---

[6] Defendants allege that the last phrase is illegible. (Def. Stat. ¶ 54.)

[7] Plaintiff characterizes Dr. Yarosh as a psychiatrist. (Pl. Stat. ¶ 60.) Defendants point out that Dr. Yarosh is a Diplomate of the American Board of Psychiatry and Neurology, and a Diplomate of the American Board of Internal Medicine. (Def. Stat. ¶ 60.)

*Plaintiff's Claims for Benefits*

On October 4, 2000, Hartford received Plaintiff's application for long-term disability benefits. (AR 714-23.) By letters dated October 5, 2000 and October 11, 2000, Hartford acknowledged receipt of Plaintiff's application for benefits, and informed her of the need to submit certain forms to be completed by her medical doctors so that it could evaluate her claim. (AR 72-73.) Thereafter, Plaintiff completed and sent Hartford additional forms as requested. (*See* AR 74.) By letter dated January 16, 2001, Hartford informed Plaintiff that it denied her application for long-term disability benefits based on the Policy's pre-existing condition limitation. (AR 532.)

By letter dated January 17, 2001, Plaintiff explained the nature of her illness and requested that Hartford put the review of her claim on hold pending reviews of test results by other medical specialists. (*See* AR 525-27.) Two weeks later, she informed Hartford by letter that she intended to appeal the denial of her claim and stated that she was in the process of gathering supporting information. *See id.* By letter dated March 14, 2001, Hartford acknowledged receipt of Plaintiff's appeal and informed her that the review process would not begin until she submitted all supporting documentation. (AR 75.) Two months later, Plaintiff retained counsel, who then requested her file. (*See* AR 519-20.)

In a letter dated June 6, 2001, Plaintiff's counsel denied the applicability of the pre-existing condition limitation, submitted documentation in support of her appeal, and requested a decision within sixty days. (AR 482.) By letter dated June 21, 2001, Hartford acknowledged receipt of these materials and informed Plaintiff that it would review them in adjudicating her appeal. (AR 70.) A week later, Hartford requested that Dr. Prasad provide Plaintiff's records for

7

certain dates of treatment. (AR 76.) Dr. Prasad did not provide this information until October

11, 2001. (AR 473-74.) By letter dated October 19, 2001, Plaintiff's counsel provided the notes

of Dr. Levine in support of Plaintiff's appeal. (AR 466.) Ten days later, Hartford referred

Plaintiff's appeal to their Medical Director for further review. (AR 464-65.) By letter dated

November 2, 2001, Hartford informed Plaintiff that it had received the additional information

provided by Dr. Levine and Dr. Prasad. (AR 461.)

In a letter dated December 10, 2001, Hartford informed Plaintiff that it denied her appeal.

(AR 81-83.) In this letter, it explained that "the documentation in [Plaintiff's] file, viewed in

whole, does not establish that the conditions of fever of unknown origin, Chronic Fatigue

Syndrome, and Fibromyalgia, from which [Plaintiff] claims to be disabled, prevent her from

performing the Essential Duties of her Occupation as a Medical Writer since her reported last day

of work May 14, 2000." (AR 83.) Thus, although the initial denial of her claim was based on

the application of the pre-existing condition limitation, her appeal was rejected because Hartford

found that she was not disabled within the meaning of the Policy. *See id.*

By letter dated February 4, 2002, Plaintiff's counsel informed Hartford that Plaintiff

wished to appeal the denial of benefits again. (AR 435.) At the time of her second appeal,

Plaintiff indicated that she would submit additional documentation within 60 days. *Id.* By letter

dated February 14, 2002, Hartford acknowledged her second appeal. (AR 75.) Plaintiff later

requested and was granted two extensions of time on March 25, 2002 and May 14, 2002 to

submit this documentation, and eventually submitted it on May 28, 2002. (AR 225-30; 432-33.)

By letter dated June 10, 2002, Hartford acknowledged receipt of Plaintiff's documentation in a

letter to her attorney. (AR 272.) Seven days later, Plaintiff's counsel submitted another medical

report in support of Plaintiff's second appeal. (AR 238.)

By letter dated July 9, 2002, Hartford informed Plaintiff that it forwarded her file to Behavioral Management, Inc. ("BMI") "for an independent board certified physician for review." (AR 218.) Hartford also requested that Drs. Prasad and Levine consent to speaking with a physician from BMI concerning Plaintiff's medical records by letters also dated July 9, 2002. (AR 219-20.) In an e-mail dated July 18, 2002, a BMI representative informed Hartford that Dr. Levine would not discuss Plaintiff's case over the phone, but would respond to its written inquiries. (AR 217.) Six days later, BMI faxed questions to Dr. Levine. (AR 215.) She did not respond until August 26, 2002. (AR 188-90.)

Throughout September 2002, Plaintiff and Hartford continued to correspond about the status of her appeal. On September 3, 2002, Hartford received the report of the BMI physician, Dr. Scott Yarosh, who completed the independent medical review of Plaintiff's case. (*See* AR 202-213.) In his addendum to this report dated September 4, 2002, he informed Hartford that Dr. Prasad's notes of Plaintiff's treatment were "vague and illegible for the most part," and therefore he could not determine whether the prescriptions issued were or were not related to CFS. (AR 191.) A week later, Hartford informed Dr. Prasad by letter that BMI would be contacting him regarding Plaintiff's medical condition. (AR 174.) By letter dated October 8, 2002, Hartford wrote to Plaintiff advising her that their medical consultant was unable to reach Dr. Prasad regarding her ability to function. (AR 168.) It also requested that Plaintiff advise them if she did not wish that the decision on her appeal be made upon consideration of Dr. Prasad's information, and if so, the decision would be made with the information then in her file. *Id.* In response, by fax dated October 21, 2002, Plaintiff advised Hartford that Dr. Prasad was "in no position to

assess plaintiff's ability to function, so Hartford was free to contact Dr. Levine." (AR 157.) On

October 28, 2002, Hartford responded that it needed to discuss Plaintiff's treatment with Dr.

Prasad in light of the Policy's pre-existing condition limitation. (AR 156.) The next day,

Plaintiff's attorney responded and advised Hartford to prepare a list of questions for Dr. Prasad

and that after this list is compiled, he would contact Dr. Prasad and "request his cooperation and

assistance." (AR 153.) Hartford affirmed the denial of Plaintiff's claim in a letter dated

November 20, 2002. (AR 137-41.)

Both parties moved for judgment on the administrative record, and exchanged opposition

and reply briefs. These were filed with this Court on February 25, 2004.

## DISCUSSION

A.    Motion for Judgment on the Administrative Record

Both parties move for "Judgment on the Administrative Record." However, they disagree

over whether these motions should be analyzed as those brought under Rule 12(c) or Rule 56 of

the Federal Rules of Civil Procedure, claiming that the standard of review of Plaintiff's denial

should be determinative of this question. (*See* Plaintiff's Memorandum in Support of Her

Motion for Judgment ("Pl. Mem.") at 2; Defendant's Legal Memorandum in Support of Motion

for Judgment ("Def. Mem.") at 10-12.) Rule 12 (c) states:

> After the pleadings are closed but within such time as not to delay the trial, any
> party may move for judgment on the pleadings. If, on a motion for judgment on
> the pleadings, matters outside the pleadings are presented to and not excluded by
> the court, the motion shall be treated as one for summary judgment and disposed
> of as provided in Rule 56, and all parties shall be given reasonable opportunity to
> present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. R. 12 (c). Accordingly, since their motions call for consideration of "matters

outside the pleadings," i.e the administrative record, and both parties have had time to present pertinent material, the Court considers their motions as cross-motions for summary judgment.

Plaintiff requests that the Court consider her motion as a "motion for judgment on the administrative record" citing *Muller v. First UNUM Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003), because she claims that summary judgment is inappropriate where the Court utilizes a *de novo* review of the denial of benefits. But the *Muller* court concluded that because the district court had already denied summary judgment on the issue of whether or not the plaintiff was disabled within the meaning of the policy, it treated the defendant's motion for judgment on the administrative record as a bench trial on the papers. *Id.* Thus, the standard of review that applied to the administrator's denial of benefits was not determinative of the treatment of the defendant's motion. The Second Circuit also characterized the motion for judgment on the administrative record as one that "does not appear to be authorized in the Federal Rules of Civil Procedure." *Id.* Further, it said "[m]any courts have either explicitly or implicitly treated [motions for judgment on the administrative record] as motions for summary judgment under Rule 56." *Muller*, 341 F.3d at 124. Similarly, in *Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp.*, 862 F. Supp. 783 (E.D.N.Y. 1995), a case cited by both parties, Judge Korman held that when the court reviews a denial of ERISA benefits applying the arbitrary and capricious standard on a summary judgment motion, it "may be more properly considered as one akin to a motion under rule 12(c) for judgment on the pleadings and the transcript of the record before the plan." *Id.* at 791. This statement guides the court on the way in which to view the claim. It does not indicate that because the claim is reviewed under the differential standard, it should therefore be considered a motion for judgment on the pleadings. Moreover, Judge Korman also suggested

11

that the difference between the motions under Rule 12(c) and Rule 56 in this context may be "more a matter of form than substance." *Id.* Accordingly, Plaintiff's request that the Court treat her motion in the same manner as the *Muller* court is granted; that is, it is treated as a motion for summary judgment.

B.     Summary Judgment Standard

Rule 56 (c) of the Federal Rules of Civil Procedure states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). In the process of ruling on a motion for summary judgment, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Childers v. United States Postal Serv.*, 2003 U.S. Dist. LEXIS 9993, at *5. "The burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994). Specifically, "a 'genuine' issue is one that could be decided in favor of the non-moving party based on the evidence by a reasonable jury." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). Yet, "conclusory allegations (by the non-moving party) will not suffice to create a genuine issue." *Id.*

C.     Standard of Review

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court announced the rule governing the review of a denial of benefits challenged under ERISA, 29 U.S.C. §1132 (a)(1)(B). The Court stated that the denial must "be reviewed under the *de novo*

12

standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. "Thus, where the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, [the court] will not disturb the administrator's conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX*, 52 F.3d 438, 441 (2d. Cir. 1995). The burden of proving that the arbitrary and capricious standard should apply is on the trustee or administrator. *Winter v. Hartford Life and Accident Ins. Co.*, 309 F. Supp.2d 409, 413-14 (E.D.N.Y. 2004). "'Any ambiguities must be construed against the administrator and in favor of the party seeking judicial review.'" *Id.* (quoting *Arthurs v. Metropolitan Life Ins. Co.*, 760 F. Supp. 1095, 1098 (S.D.N.Y. 1991)).

Plaintiff argues that the Plan did not grant discretionary authority to Hartford to determine benefit eligibility. (Pl. Mem. at 3-4.) She points out that her employer, Pharmanet, Inc., and not Hartford, is listed as the Plan Administrator. (Pl. Mem. at 4.) Defendants argue that discretionary authority is given to Hartford through language in the Policy that states: "We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the [Policy]." (Def. Mem. at 12.)

A plan regulated by ERISA must, *inter alia*, "describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan." 29 U.S.C. § 1102 (b)(2). It can do this by "expressly provid[ing] for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary

responsibilities (other than trustee responsibilities) under the plan." 29 U.S.C. § 1105 (c)(1).[8]

Pharmanet, Inc., as Plan Administrator, does not explicitly grant discretionary authority to

Hartford in the three documents that comprise the Summary Plan Description ("SPD") required

by ERISA (*e.g.*, the Policy, the Conforming Instrument, and the Statement of ERISA Rights).

(*See* AR 43.) However, after analysis, there is no ambiguity as to whether discretionary authority

was delegated to Hartford.

In this Circuit, an employee welfare benefit plan need not include "magic words" such as

"deference" or "discretion" to demonstrate that it delegated discretionary authority to the plan

administrator or plan fiduciary. *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*, 46

F.3d 1264, 1271 (2d Cir. 1995). However, the grant of discretion to the administrator must be

clear. *Kinstler v. First Reliance Standard Life Insurance Co.,* 181 F.3d 243, 251 (2d Cir. 2000).

In the recent case of *Nichols v. Prudential Ins. Co.*, 406 F.3d 98 (2d Cir. 2005), the court stated:

"Examples of such clear language include authorization to 'resolve all disputes and ambiguities,'

or make benefits determinations 'in our judgment.' In general, language that establishes an

objective standard does not reserve discretion, while language that establishes a subjective

standard does." 406 F.3d at 108 (citations omitted).

Here, the plan informs participants that "[t]he benefits described in your booklet are

provided under a group plan by the Insurance Company and are subject to the terms and

---

[8] Further,

> the term 'named fiduciary' means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.

29 U.S.C. § 1102(a)(2).

14

conditions of that plan." (AR 44.) It also states, under the heading, "Type of Administration,"

"The plan is administered by the Plan Administrator with benefits provided in accordance with

the provisions of the applicable group policy." *Id.* The Policy, in turn, states that Hartford, the

issuer of the Policy, has "full discretion and authority to determine eligibility." (*See* AR 42.)

Accordingly, the "magic words" do appear in the policy. *See Winkler v. Metropolitan Life Ins.*

*Co.*, 2004 U.S. Dist. LEXIS 16866, at *5 (Aug. 24, 2004) ("because the SPD invests [the

Insurance Company] with authority to evaluate claims and to review participant's appeals, [it] is

a fiduciary for purposes of ERISA and the SPD's reservation of discretionary authority applies to

[it]"). Moreover, courts in this Circuit and beyond, have read the exact language in Hartford's

plan quoted above as a grant of discretionary authority from the plan to Hartford. *Winter*, 309 F.

Supp.2d at 413-14; *Tripp v. Hartford Life and Accident Ins. Co.*, 2004 U.S. Dist. LEXIS 18881,

at *12 (D. Me. September 17, 2004); *Johnston v. Hartford Life and Accident Ins. Co.*, 2004 U.S.

Dist. LEXIS 16683, at *25 (E.D. Pa. August 19, 2004); *see also McCleod v. Hartford Life and*

*Accident Ins. Co.*, 372 F.3d 618 (3d Cir. 2004) (applying a heightened deferential standard as

opposed to *de novo review*, in accordance with Third Circuit precedent, to review claim with

similar plan language).[9] Plaintiff's argument therefore fails; discretionary authority was granted

to Hartford in the language of the plan. As a result, the Court will review Hartford's decision

applying the arbitrary and capricious standard.

Plaintiff also argues that Hartford's untimely review of her appeal demonstrates that they

failed to exercise their discretion, and therefore she is entitled to *de novo* review of her claim.

---

[9] Also, in cases where a claimant challenges the denial of benefits by Hartford, the parties have agreed to
the arbitrary and capricious standard of review. *See O'Reilly v. Hartford Life and Accident Ins. Co.*, 72 F.3d 955
(7th Cir. 2001); *Seddon v. Hartford Life and Accident Ins. Co.*, 174 F. Supp.2d 991, 996 (W.D. Mo. 2001).

(Pl. Mem. at 4-5.) The language of the Plan (*see* AR 46), and ERISA regulations, 29 C.F.R. §

2560.503-1(h)[10], require that the plan make a decision on an appeal of a denial of benefits within

sixty days and, should special circumstances require and if written notice is provided to the

claimant, the plan has another sixty days to review the claim. Even with clear guidance from the

federal regulations, there is a conflict among courts regarding the consequences of not meeting

these deadlines. *Compare Jebian v. Hewlett-Packard Emp. Ben. Org. Income Protection Plan*,

349 F.3d 1098, 1107-08 (9th Cir. 2003), *cert. denied*, 125 S. Ct. 2956, 2005 U.S. LEXIS 5037

(June 27, 2005) (holding that the administrator's failure to communicate with plaintiff until

119th day of the 120-day review period subjects that decision to *de novo* review); *Gilbertson v.*

*Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003) (adopting a substantial compliance rule

where "in the context of an ongoing, good faith exchange of information between the

administrator and the claimant, inconsequential violations of the deadlines...would not entitle the

claimant to *de novo* review."); and *Gritzer v. CBS, Inc.*, 275 F.3d 291, 295-96 (3d Cir. 2002);

*with Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993) (applying

the arbitrary and capricious standard, holding, "[i]n our view, the standard of review is no

---

[10] In relevant part, the regulation provides:

> the plan administrator shall notify a claimant ...of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 60-day period. In no event shall such extension exceed a period of 60 days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the determination on review.

29 C.F.R § 2560.503-1(h)(1) (2001).

16

different whether the claim is actually denied or is deemed denied" by virtue of the administrator's failure within sixty-days); and *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000) ("the mere presence of procedural irregularity is not enough to strip a plan administrator of the deferential standard of review").

In *Nichols*, the Second Circuit rejected the substantial compliance approach used in *Gilberston* where the administrator argued that plaintiff's federal claim should be dismissed for failure to exhaust her administrative remedies although it failed to decide plaintiff's appeal before the expiration of the regulatory deadline. *See Nichols*, 406 F.3d 107. The court found that permitting the administrator to avoid the consequences of its failure to comply with regulatory deadline could effectively block the claimant's access to the federal courts. *Id.* Yet, the court explicitly declined to foreclose the application of the substantial compliance exception in situations such as the one presented here. *Nichols*, 406 F.3d at 109. In fact, it stated that "[t]here may be good equitable and policy reasons for a substantial compliance exception to our holding today that may even be sufficient to overcome our analysis of the requirement of Firestone." *Id.* at 109-110 (citing *Gilbertson*, 328 F.3d at 634-36).

Defendants cite *Campanella v. Mason Tender's District Council Pension Plan*, 299 F. Supp. 2d 274 (S.D.N.Y. 2004), *aff'd on other grounds*, 2005 U.S. App. LEXIS 3081 (Feb. 22, 2005), as support for their argument that the Court should apply the arbitrary and capricious standard despite their untimely notification of the denial of Plaintiff's benefits on either appeal. (Def. Mem. at 9.) After reviewing the conflicting authority, the *Campanella* court pointed to the fact that although the Trustees were late in making their decision, they did give the claimant the benefit of a written decision explaining the reasons for their denial, at the claimant's request,

17

prior to the commencement of the suit. *Id.* at 290. This approach is consistent with the policy underlining the regulations. *See Gilbertson*, 328 F.3d at 635 ("ERISA's procedural regulations are meant to promote accurate, cooperative, and reasonably speedy decision-making."). Also, in *Nichols v. Prudential Ins. Co.*, 306 F. Supp.2d 418 (S.D.N.Y. 2004), *vacated on other grounds*, 406 F.3d 98 (2d Cir. 2005), the district court wrote that "when the administrator identifies appeals that may warrant additional scrutiny and begins in good faith to investigate and consider that claim within a period manifesting substantial compliance with the regulatory limits and notifies the claimant that it is doing so, that process should be allowed to run its course for a reasonable time, as long as the administrator continues to exhibit good faith." *Nichols*, 306 F. Supp. 2d at 423. Thus, the case law in this Circuit indicates that where the administrator communicates with the claimant regarding the status of her appeal, acts in good faith, and does not delay its decision unreasonably, its failure to comply with the regulation deadlines may be excused.

Here, Hartford was in substantial compliance with the regulatory deadline. Although Plaintiff claims that she submitted her first appeal on June 6, 2001, did not receive a decision until December 10, 2001, requested decision on her second appeal on May 28, 2002, and did not receive a decision until November 20, 2002, the record demonstrates that this dry recitation of dates obfuscates the true circumstances surrounding the adjudication of Plaintiff's appeals. With respect to her first appeal, once Hartford received medical records from Dr. Prasad on October 11, 2001–three and half months after it requested them, the parties were in regular contact such that Plaintiff's counsel's last letter to Hartford in support of her appeal is dated fifty-two days before Hartford made its decision. (*See* AR 466; 473-74.) Regarding her second appeal, after

Hartford forwarded her file to BMI for an independent review in July 2002, it did not receive information from Dr. Levine, Plaintiff's treating physician, until August 26, 2002 although it was requested five weeks earlier. (*See* AR 215; 188-90.) After BMI submitted its report in September 2002, Hartford sought to contact Dr. Prasad to confirm whether the pre-existing condition limitation in the Policy should apply to Plaintiff's claim. After numerous failed attempts,[11] when Hartford contacted Plaintiff for assistance in contacting Dr. Prasad, she was initially resistant. Although Plaintiff soon thereafter agreed to cooperate, Hartford made its decision without Dr. Prasad's information four weeks later.

The pattern of interaction between the parties demonstrates that Plaintiff sought and waited for Hartford to exercise its discretion, and that she relied on this exercise before coming to this Court. It also shows that the delays in making determinations on her claims cannot be characterized as dilatory or as evidencing bad faith on the part of Hartford. As a result, the delay was nugatory, and should not be held against the Defendants.

Plaintiff also suggests that Defendants' denial should not be reviewed under the *de novo* standard because there may be a conflict of interest where the plan administrator determines entitlement as well as pays the claim. (Pl. Mem. at 8-9.) Specifically, Plaintiff alleges that because Hartford denied her access to Dr. Yarosh's report before making their final determination on her second appeal, they acted in an adversarial manner, and therefore demonstrated a conflict of interest. (Pl. Mem. at 8.) To prevail on this argument, Plaintiff must show that the determination made by Hartford was unreasonable or that Hartford was influenced

---

[11] BMI informed Hartford that it had attempted to reach Dr. Prasad six times in September 2002, one time in October 2002, and another time in November 2002 to no avail. (AR 146-47.)

by this conflict. *Sullivan v. LTV Aero. & Defense Co.*, 82 F.3d 1251, 1255-1256 (2d Cir. 1996). In addition, she has the burden of "show[ing] that the administrator was in fact influenced by the conflict of interest." *Snyder v. First Unum Life Ins. Co.*, 2004 U.S. Dist. LEXIS 16258, at \*7 (W.D.N.Y. Aug. 4, 2004), *aff'd*, 2005 U.S. App. LEXIS 14874 (2d Cir. July 13, 2005) (*citing Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000)). Plaintiff's evidence of a conflict of interest is based on conclusory allegations and therefore does not suffice to meet her burden. Accordingly, the Court will review the denial of Plaintiff's claim under the arbitrary and capricious standard.[12]

C.      Adjudication of Plaintiff's Claim

As discussed above, Plaintiff's claim must be reviewed under the arbitrary and capricious standard. Under this standard, the scope of review of the plan's decision is narrow. *Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003). Although the court must consider "whether the decision was based on a consideration of the relevant factors," *Jordan*, 46 F.3d at 1271, the court "may overturn a plan administrator's decision to deny benefits only if the decision was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Celardo*, 319 F.3d at 146 (*quoting Pagan*, 52 F.3d at 442). The Second Circuit defines substantial evidence as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by [the Plan] and...requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d

---

[12] Yet, in accordance with the Supreme Court's decision in *Firestone,* the Court will consider this conflict of interest in applying the arbitrary and capricious standard to review Hartford's denial of Plaintiff's claim. *See Firestone*, 489 U.S. at 115 ("[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.") (internal quotation marks omitted).

Cir. 1995). Further, the court may not "substitute its judgment for that of the [plan administrator] to determine eligibility anew." *Pagan*, 52 F.3d at 442. Accordingly, on a summary judgment motion, the Court will uphold the administrator's decision "unless it is not grounded on any reasonable basis." *Scannell v. Metropolitan Life Ins. Co*, 2003 U.S. Dist. LEXIS 20749, at *19 (S.D.N.Y. Nov. 18, 2003) (internal quotation marks omitted).

Under the terms of the Plan, Plaintiff had to establish that from May 22, 2000 to August 22, 2002, she was unable to perform "one or more of the Essential Duties" of being a Medical Writer, and from August 2002 to the present, she was unable to perform "one of more of the Essential Duties of Any Occupation." (AR 30.) Plaintiff argues that Hartford "relied upon [a] selective review of medical evidence" to determine that she was not disabled during these time periods, and was therefore arbitrary and capricious. (Pl. Mem. at 9-11.) However, Hartford was under no obligation to "accord special weight to the opinions of a claimant's physician" and did not have the "discrete burden of explain[ing] when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Moreover, a decision to deny ERISA benefits is neither arbitrary or capricious where it is "essentially a decision to value the opinion of its independent physician above the opinion of Plaintiff's physician." *Solaas*, 2005 U.S. Dist. LEXIS 5269, at * 8. In light of the voluminous record before the Court, it appears that Hartford reviewed all of the material it could obtain from the multitude of doctors who examined Plaintiff, and simply credited the reports of its Associate Medical Director, Dr. Malievskaia, and the independent medical review of Dr. Yarosh to find that Plaintiff was not disabled within the meaning of the Policy. This decision is not unreasonable. *See id.*

In addition, it is reasonable for the administrator to require an objective component to proof of disability. *See Maniatty v. UNUMProvident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 Fed. Appx. 413 (2nd Cir. 2003), *cert. denied*, 540 U.S. 966 (2003) ("the plan itself does not state that objective evidence is necessary to establish disability, the plan does state that 'proof' of continued disability must be provided, and the very concept of proof connotes objectivity"); *Alakozai v. Allstate Ins. Co.*, 2000 U.S. Dist. LEXIS 3816, at *19 (S.D.N.Y. Mar. 28, 2000). With respect to Plaintiff's claim, although CFS is a "debilitating illness" that is "often difficult to diagnose...[It] is not arbitrary and capricious to deny a difficult-to-prove claim that has not objectively been shown to exist...A physician's statement that a physician feels he is disabled is not enough, nor is a physician's conclusion, without supporting objective medical evidence, that a patient probably has CFS." *Michele v. NCR Corporation*, 1995 U.S. App. LEXIS 11608, at *8 (6th Cir. May 15, 1995). Further, the burden is on the Plaintiff to establish that she was disabled within the meaning of the plan. *Mario v. P & C Food Mkts.*, 313 F.3d 758, 765 (2d Cir. 2002). Although Plaintiff provided objective medical evidence to support her claim, *e.g.* the results of her laboratory and neuro-cognitive testing, it is reasonable for Hartford to have concluded that that evidence was insufficient. Likewise, it was reasonable for it to heed the conclusions of Dr. Malievskaia and Dr. Yarosh that there was not enough objective evidence to to establish that Plaintiff was disabled within the meaning of the Policy. Consequently, Plaintiff has failed to meet her burden to establish that Hartford was unreasonable in denying her claim for disability benefits.

## CONCLUSION

The Court considers the parties' motions for judgment on the administrative record as

cross-motions for summary judgment. Since discretionary authority was granted to Hartford by the terms of the plan, the Court applies the arbitrary and capricious standard to review of Hartford's decision to deny Plaintiff's long-term disability benefits. Applying this deferential standard, it was reasonable for Hartford to deny Plaintiff's benefits claim. Thus, Plaintiff's motion is denied and Defendants' motion for summary judgment dismissing the complaint is granted.

**SO ORDERED.**

SANDRA L. TOWNES
UNITED STATES DISTRICT JUDGE

Dated:      August 23, 2005
              Brooklyn, NY